**Barry ARMSTRONG and Kim Armstrong, Plaintiffs,**

**v.**

**Michael LAMY, Thomas Lamy in his capacity as Executor for the Estate of Cecilia Lamy, Thomas Lamy, Philip Lamy, Catherine (Lamy) Puzzo, City of Peabody, Robert Ireland, individually and in his capacity as Superintendent of Schools, Edward J. O'Connor, individually and in his capacity as Principal, J. Henry Higgins Junior High School, Nicholas Mavroules, individually and in his capacity as a member of the Peabody School Committee, Edward J. Dullea, Jr., individually and in his capacity as a member of the Peabody School Committee, David J. Hallinan, individually and in his capacity as a member of the Peabody School Committee, Stephen L. Delaney, individually and in his capacity as a member of the Peabody School Committee, Margaret E. McBreen, individually and in her capacity as a member of the Peabody School Committee, Antoinette T. Potter in her capacity as Execu-**

trix of the Estate of Raymond F. Potter, individually, and Potter in his capacity as a member of the Peabody School Committee, Walter A. Roche, individually and in his capacity as a member of the Peabody School Committee, Defendants.

Civil Action No. 94–11426–REK.

United States District Court,
D. Massachusetts.

Aug. 27, 1996.

Neila J. Straub, Straub & Meyers, Salem, MA, John D. Keenan, Straub & Meyers, Sacon, MA, for Barry Armstrong.

Neila J. Straub, Straub & Meyers, Salem, MA, for Kim Armstrong.

Michael J. Conley, Wakefield, MA, for Michael Lamy, Catherine Puzzo, Philip Lamy.

John J. Davis, Tory A. Weigand, Elizabeth M. Fahey, Morrison, Mahoney & Miller, Boston, MA, for City of Peabody, Robert Ireland, Edward J. O'Connor, Nicholas Mavroules, Edward J. Dullea, Jr., David J. Hallinan, Stephen L. Delaney, Margaret E. McBreen, Raymond F. Potter.

John J. Davis, Morrison, Mahoney & Miller, Boston, MA, for Walter A. Roche.

Marjory D. Robertson, Curley & Curley, Boston, MA, Michael J. Conley, Wakefield, MA, for Thomas Lamy.

KEETON, District Judge.

This is an action brought under 42 U.S.C. § 1983, by Barry Armstrong and Kim Armstrong, for civil rights violation, and under pendant jurisdiction for common-law torts and violation of Mass.Gen.L. ch. 12 § 11I.

This action, filed July 14, 1994, arises out of the alleged sexual abuse of Barry Armstrong in the 1970s, when he was a teenage student at Higgins Junior High School in Peabody, Massachusetts. Defendant Michael Lamy, a music teacher at the Higgins Junior High School, allegedly had sexual contact with Barry Armstrong on school property, at Lamy's residence, and in a vehicle operated by Michael Lamy. Plaintiff Barry Armstrong and his wife Kim Armstrong have brought a complaint containing 29 counts, including Kim Armstrong's claim against each defendant for loss of consortium. Plaintiffs allege one or more counts against each of 15 defendants.

For convenience of reference, the claims are grouped as follows:

(1) The plaintiffs have brought a federal claim under 42 U.S.C. § 1983, a Massachusetts Civil Rights Act ("MCRA") claim under Mass.Gen.L. ch. 12 § 11I, and common-law tort claims of negligence and loss of consortium against Edward O'Connor (Principal of Higgins Junior High School), Robert Ireland (Superintendent of the Peabody School System), seven members of the Peabody School Committee, and the City of Peabody. Collectively, these defendants are referred to here as the "Municipal Defendants."

(2) The plaintiffs have also brought an MCRA claim and common-law tort claims of negligence, negligent and intentional infliction of emotional distress, and loss of consortium against Michael Lamy's siblings, Thomas Lamy, Philip Lamy, and Catherine (Lamy) Puzzo, as well as against Thomas Lamy in his capacity as executor of the estate of Cecilia Lamy (Michael Lamy's mother). Collectively, these defendants are referred to here as the "Lamy Family Defendants."

(3) Finally, the plaintiffs have brought an MCRA claim and common-law tort claims of negligence, negligent and intentional infliction of emotional distress, assault, battery, and loss of consortium against defendant Michael Lamy.

Now pending before this court are motions for summary judgment for all defendants on all claims.[1]

For convenience, a Table of Organization of this Opinion is presented below.

I. Summary Judgment Standard ........................................... 1027
II. Factual Background .................................................. 1027
 A. Facts relating to the alleged sexual contact between Barry Armstrong and Michael Lamy ................................................ 1028
 B. Facts relating to the Statute of Limitation ............................... 1028
 C. Facts relating to Municipal Defendants ................................. 1029
 D. Facts relating to Lamy Family Defendants .............................. 1030
III. Section 1983 Claim Against Municipal Defendants ......................... 1031
 A. Statute of Limitation Applied to § 1983 Claim .......................... 1031
 B. Supervisory Liability ................................................ 1033

**1.** The motions, together with supporting and opposing filings, are as follows:

(1) Municipal Defendants' Motions for Summary Judgment (Docket No. 44, filed November 20, 1995 and Docket No. 58, filed December 29, 1995); together with supporting materials (Docket Nos. 45, 80, 81, 82, 95, and 96). Plaintiffs have filed an Opposition and supporting materials (Docket Nos. 79, 86, 90, and 91).

(2) Lamy Family Defendants' Motion for Summary Judgment (Docket No. 53, filed December 22, 1995), together with supporting materials (Docket Nos. 54, 55, 64, 76, 77, 78, 85, 92, 93, and 94). Plaintiffs have filed an Opposition and supporting materials (Docket Nos. 59, 66, 79, 84, 90, and 91).

(3) Michael Lamy's Motion for Summary Judgment (Docket No. 70, filed March 13, 1996); together with supporting materials (Docket No. 83). Plaintiffs have filed an Opposition and supporting materials (Docket No. 73, 90, and 91).

C. Municipal Liability .................................................1035
 (1) Liability for Failure to Supervise ...................................1035
 (2) Liability for Inadequate Hiring Policy ...............................1036
 (3) Liability for Failure to Train .......................................1036
IV. Supplemental Jurisdiction Over State Law Claims .........................1037
V. Statute of Limitation Applied to State Law Claims .........................1037
VI. Massachusetts Civil Rights Act Claim Against Municipal Defendants ...........1041
VII. Common–Law Tort Claims Against Municipal Defendants .....................1042
 A. Common–Law Tort Claims Against Municipal Defendants Individually....1042
 B. Common–Law Tort Claims Against the City of Peabody...................1043
 (1) Massachusetts Tort Claims Act Protections Against Accountability....1043
 (2) Municipal Liability for Alleged Negligent Acts of Public Employees
 other than Michael Lamy .......................................1043
 (3) Municipal Liability for Michael Lamy's Alleged Negligent Acts .........1044
 (4) Municipal Liability for Negligent Hiring .............................1045
 C. Loss of Consortium Claim Against Municipal Defendants .................1046
VIII. Common–Law Tort Claims Against the Lamy Family Defendants .............1046
 A. Legal Duty of Family Members......................................1046
 B. Negligence Claims Against Lamy Family Defendants.....................1048
 C. Claims Against Lamy Family Defendants for Intentional Infliction of
 Emotional Distress..............................................1049
 D. Loss of Consortium Claim Against Lamy Family Defendants .............1049
IX. Claims Against Michael Lamy .........................................1050
 A. Jurisdictional Issues...............................................1050
 B. Claims Asserted ................................................1050
 C. Michael Lamy's Motion for Summary Judgment ........................1050
 (1) Statute of Limitation ...............................................1050
 (2) Loss of Consortium Claim Against Michael Lamy .....................1050
X. Conclusion .......................................................1051
XI. Interlocutory Order ...............................................1052

## I. Summary Judgment Standard

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is appropriate, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). To survive the motion, the nonmoving party need only present evidence from which a jury might return a verdict in its favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). Where, as here, the moving party does not have the burden of proof at trial, that party nevertheless must make a showing, by "pointing out to the district court," that the evidence is insufficient to support the nonmoving party's case. *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2554. Once this showing has been made, it is up to the nonmoving party to proffer sufficient competent evidence to establish the existence of a genuine issue of material fact. *United States v. One Parcel of Real Property,* 960 F.2d 200, 204 (1st Cir.1992). "Genuine" means that "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a "material fact" is one that "might affect the outcome of the suit under governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. On issues where the nonmovant bears the burden of proof, he or she must present definite, competent evidence to rebut the motion. *Id.* at 256–57, 106 S.Ct. at 2514–15.

## II. Factual Background

This statement of the factual background recites facts as disclosed by the record before the court, viewed, for the purposes of summary judgment, in the light most favorable to the plaintiffs.

## A. Facts relating to the alleged sexual contact between Barry Armstrong and Michael Lamy

Plaintiff Barry Armstrong was born on June 24, 1960. From 1972 through 1975, from age 12 through age 15, Barry Armstrong was a student attending seventh grade through ninth grade at the Higgins Junior High School, in Peabody, Massachusetts. Defendant Michael Lamy was employed by the City of Peabody as a music teacher at the Higgins Junior High School from 1971 to 1976.

In the fall of 1972, when Barry Armstrong was a 12–year–old student in the seventh grade, he first met Michael Lamy. Throughout the time that Barry Armstrong was in junior high school, he participated and performed in school plays that were directed by Michael Lamy. From 1972 through 1975, Barry Armstrong saw Michael Lamy on almost a daily basis. They were often alone together at school and on the school's premises. In addition, during this time period, Michael Lamy invited Barry Armstrong to sleep over at the Lamy Family residence after school hours and on weekends.

From approximately December, 1973 through March, 1975, a sixteen-month period, defendant Michael Lamy allegedly had sexual contact with plaintiff Barry Armstrong. The sexual contact between Barry Armstrong and Michael Lamy occurred at various locations including the Lamy Family residence on Drury Lane in Danvers, at the Higgins Junior High School in Peabody, in an automobile operated by Defendant Michael Lamy, and on camping trips in New Hampshire and other outings with Michael Lamy.

Defendant Michael Lamy's sexual contact with Barry Armstrong allegedly included fondling Armstrong's genitals, causing Armstrong to fondle Michael Lamy's genitals, performing fellatio on Armstrong, and causing Armstrong to perform fellatio on Michael Lamy. On at least two occasions, Michael Lamy attempted to have anal intercourse with Barry Armstrong, but Barry Armstrong turned his body, moved away and did not let this happen. Michael Lamy also attempted to kiss Barry Armstrong's face, but Barry Armstrong turned his face away and did not let this happen. Michael Lamy also caused Barry Armstrong to drink beer, and the attempts at anal intercourse were at times when Barry Armstrong was intoxicated.

## B. Facts relating to statute of limitation

Barry Armstrong has stated that, at the time the alleged sexual contact was occurring, it did not upset him or bother him, because he "really had no sexual contact at thirteen, [so he] had nothing to compare it to." He stated that he "enjoyed the attention" from Michael Lamy, and "enjoyed [the sexual contact] somewhat." He stated that on the first occasion of sexual contact he was "a little nervous," and "scared," because the sexual contact was "new" and "different." After the first occasion, the sexual contact became "routine." He stated that, later on, he felt "uncomfortable" when Michael Lamy attempted anal intercourse with him and attempted to kiss him on the face. Barry Armstrong has also stated that he felt "sore" for a day after the alleged attempts at intercourse, and may have experienced physical pain when Michael Lamy squeezed his arm. During the time period of the alleged sexual contact, Barry Armstrong remembers "not sleeping well," especially when he slept over at Michael Lamy's house.

At the time of the sexual contact, Barry Armstrong "admired" Michael Lamy, and considered him his "mentor." Barry Armstrong's parents "liked" and "looked up to" Michael Lamy. Barry Armstrong's parents always gave their permission for Barry Armstrong to stay over at Michael Lamy's home, and never questioned why Michael Lamy invited him.

A dispute exists among the parties as to whether Barry Armstrong forgot or repressed his memories of the alleged sexual contact between the time of the sexual contact in 1973 to 1975 and October 1992. Defendants point out that Barry Armstrong has made a number of shifting and contradictory statements during his deposition; he has testified *both* that he remembered the sexual contact over time and that he repressed memories of the sexual contact over time.

In his deposition Barry Armstrong at first testified that he repressed all memory of the alleged sexual contact within months after it stopped, and had no memories of the alleged sexual contact until the fall of 1992 when he saw his son in a play in the first grade. Later in the deposition, however, Barry Armstrong stated that the sexual contact was "something he lived with" and was always "back in [his] mind." At one point in the deposition, Barry Armstrong stated that he remembered the sexual contact over time, but not as "vividly" as he did after his son was in the play at school. Further he testified that he "may have been somewhat aware of the [sexual contact]" over time. He acknowledged that he may have told two of his friends "something to the effect that" the sexual contact "was always in the back of [his] mind."

In September of 1991, Barry Armstrong began to suffer and continues to suffer post-traumatic stress disorder, paranoia, insomnia, headaches, nightmares, appetite loss, dysthymia, stomach aches, inability to concentrate, depression, lack of trust, extreme mental distress, and emotional harm. He has experienced suicidal ideation, for which he was hospitalized for several days in August and September 1995. It is undisputed by the parties, for the purposes of summary judgment, that Barry Armstrong did not and was not able to connect the earlier sexual contact with these later severe psychological and physical manifestations until October of 1992, when he went to see his son perform in a school play.

## C. Facts relating to Municipal Defendants

Robert Ireland was the Superintendent of the Peabody School System from March 1972 to June 1983. Edward O'Connor was the principal of the Higgins Junior High School between 1970 and 1981. David Hallinan, Walter Roche, Margaret McBreen, Edward Dullea, Jr., and Raymond Potter, all served as members of the Peabody School Committee during the time Barry Armstrong was a student at the Higgins Junior High School. Nicholas Mavroules served as a mayor for the City of Peabody between 1968 and 1978

and served as Chairman Ex–Officio of the Peabody School Committee during this time by virtue of his position as mayor.

Defendant Michael Lamy served as a music teacher at the Higgins Junior High School from 1971 to 1976. Before he was offered this position, Lamy provided a transcript and references, including a reference from the former Dean or Director of the Music Education Department at the Boston Conservatory of Music, where Lamy had graduated in 1971 with a Bachelor of Science Degree in music education. During his year at the Conservatory, Lamy served as a student assistant in the Peabody School System, during which time a full-time position became available. At no time before he took the position or during his service as a teacher did Lamy have any type of criminal or arrest record. No evidence has been proffered of any previous sexual misconduct by Michael Lamy before the alleged sexual contact with Barry Armstrong.

Only two instances of sexual contact between Barry Armstrong and Michael Lamy are alleged to have occurred at the Higgins Junior High School. Barry Armstrong was not sure when the two contacts at the High School occurred other than sometime during 1973, 1974, or 1975. No evidence has been proffered of any other sexual contact between Michael Lamy and Barry Armstrong at the Higgins Junior High School or any other school property or facility at any time. All other sexual contact with Michael Lamy alleged by Barry Armstrong is asserted to have taken place when he slept over at the Lamy Family home, or on certain camping trips, or in Michael Lamy's car. None of the camping trips or sleep-overs at the Lamy Family home was a school-sponsored event.

As to the two alleged instances of sexual contact at the Higgins Junior High School, the first occurred during an after-school rehearsal behind the stage. Michael Lamy allegedly "initiated some fondling ..., and just as soon as we started ... we heard somebody jiggling ... keys and coming in." Barry Armstrong did not see or know who the person was. The second alleged incident occurred on a Saturday or Sunday when Barry Armstrong went to pick up an amplifi-

er in one of the practice rooms. Some fondling took place, but when they heard someone say something, the fondling stopped. Barry Armstrong does not know who the person was, what he or she said, or whether he or she saw anything.

On three to four occasions, Barry Armstrong came to school late with Michael Lamy, and as they came through the main door of the school, Edward O'Connor and Michael Lamy acknowledged each other in Barry Armstrong's presence.

Barry Armstrong has proffered no other evidence that any of the individual Municipal Defendants had any knowledge of the alleged sexual contact between Barry Armstrong and Michael Lamy. Barry Armstrong never told any school official of the alleged sexual contact with Michael Lamy.

During her first month as a School Committee member, Margaret McBreen requested that the School Committee purchase a film called "Beware of the Friendly Strangers," to be shown to elementary school children. The film was never shown at the Higgins Junior High School and the principal, Mr. O'Connor, never heard of the film and never assembled students to see such a film. Although Ms. McBreen was aware of several problems of sexual molestation of school children in Massachusetts and throughout the nation, she was not aware of any acts or complaints of sexual misconduct of any Peabody School teachers at that time. Barry Armstrong has presented no other facts to indicate that the municipal defendants were aware of any problems of sexual abuse of students at the Higgins Junior High School.

At the Higgins Junior High School, no written policies existed regarding a discipline code for teachers. No written manuals or guidelines defined appropriate teacher conduct or proper student-teacher relationships. No rules or regulations prohibited teachers from having students sleep over at their homes.

Mary Sultzer, a student at the same time as Barry Armstrong, stated in her affidavit (Docket No. 44, Ex. 11) that "the environment at the Higgins Junior High School was like a 'zoo' in that there was little discipline of students and [that] some of the teachers [including Lamy] freely fraternize[d] with the students both during and after school hours," that "neither the teachers nor the administrators did anything to control this loose atmosphere," and that "both the students and many of the teachers were given too much freedom to do as they wished."

## D. Facts relating to Lamy Family Defendants

During the time period of the alleged sexual contact, Michael Lamy, Philip Lamy and Thomas Lamy, as well as Cecilia Lamy, her husband and other Lamy siblings, lived in the Lamy Family home. Catherine (Lamy) Puzzo did not live in the Lamy Family home during this time period, but visited on occasional weekends. Barry Armstrong stayed overnight at the Lamy family home during the time period of the alleged sexual contact approximately 20 to 30 times. Barry Armstrong stayed at the Lamy family home to visit Michael Lamy and at Michael Lamy's invitation, and none of the other Lamy Family Defendants ever invited him to stay over.

On the occasions when he slept over at the Lamy family home, Barry Armstrong usually slept in Michael Lamy's bedroom, at Michael Lamy's invitation, and the alleged sexual contact occurred in Michael Lamy's bedroom behind closed doors. On one or two occasions, Barry Armstrong slept downstairs in the family room rather than in Michael's bedroom because he was "nervous" and did not want the other Lamy family members to see him go into Michael Lamy's bedroom. Barry Armstrong tried to keep the sexual contact hidden from the other Lamy family members. To Barry Armstrong's knowledge, no Lamy family member ever saw him enter or leave Michael's bedroom. Although he occasionally drank liquor and smoked marijuana in the Lamy Family home, Barry Armstrong proffers no evidence that any Lamy Family member (other then Michael) was aware of these activities.

Barry Armstrong does not recall Cecilia Lamy or Catherine (Lamy) Puzzo making any comments to suggest that they were

aware of the sleeping arrangements or aware of any alleged sexual contact.

Philip Lamy and Thomas Lamy allegedly made three statements that Barry Armstrong claims suggest that they knew of the alleged sexual contact. Barry Armstrong believes that the first comment, calling him "Michael's little boy," was made in 1976, after he had joined a band with Philip and Thomas Lamy called the Lamy Brothers Band. The second comment, also calling him "Michael's little boy," was made at the Eagle Mountain Lodge in New Hampshire in 1978. On a third occasion, while Barry Armstrong was at the Eagle Mountain Lodge, Thomas and Philip teased him about a gay hotel employee liking him. Each of these three comments was made between one year and three years after the alleged sexual contact had stopped in 1975. Although Barry Armstrong played in a band with Philip and Thomas Lamy for many years following the sexual contact with Michael Lamy, these three comments are the only comments upon which Barry Armstrong relies to show that Philip and Thomas Lamy had knowledge of the sexual contact between Barry Armstrong and Michael Lamy.

No Lamy Family Defendant has ever told Barry Armstrong that he or she knew about the alleged sexual contact. Barry Armstrong never told any Lamy Family Defendant of the alleged sexual contact with Michael Lamy.

### III. The 42 U.S.C. § 1983 Claim (Count 28)

Plaintiff Barry Armstrong alleges a claim under 42 U.S.C. § 1983 against the principal, the superintendent of schools, seven members of the school committee, and the City of Peabody (collectively, the "Municipal Defendants"). Barry Armstrong has not brought a § 1983 claim against the teacher, Michael Lamy.

Plaintiff Barry Armstrong bases his § 1983 claim on the assertion that the Municipal Defendants violated his constitutional right to be free from sexual abuse by his school teacher. Although neither the First Circuit nor the Supreme Court has spoken on the matter, I note that the Third and the Fifth Circuits have held that such a constitu-

tional right exists. *See Doe v. Taylor Independent School Dist.*, 15 F.3d 443, 445 (5th Cir.1994) (en banc) (holding that "schoolchildren do have a liberty interest in their bodily integrity that is protected by the Due Process Clause of the Fourteenth Amendment and that physical sexual abuse by a school employee violates that right"), *cert. denied sub nom, Lankford v. Doe*, — U.S. —, 115 S.Ct. 70, 130 L.Ed.2d 25 (1994); *Stoneking v. Bradford Area School Dist.*, 882 F.2d 720, 727 (3rd Cir.1989) (student's "right to bodily integrity under the Due Process Clause [encompasses] a student's right to be free from sexual assaults by his or her teachers," distinguishing *DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) because "DeShaney's injuries resulted at the hands of a private actor, whereas Stoneking's resulted from the actions of a state employee."), *cert. denied sub nom Smith v. Stoneking*, 493 U.S. 1044, 110 S.Ct. 840, 107 L.Ed.2d 835 (1990).

For purposes of deciding the motions now pending, I will assume, without deciding, that Barry Armstrong had a constitutional right to be protected from sexual abuse by his school teacher, and that his right was clearly established in law by the dates in question. The issues to be decided concern whether plaintiffs have proffered sufficient evidence to establish that one or more of the Municipal Defendants may be held liable for violation of Barry Armstrong's constitutional right. I need not discuss whether the teacher, Michael Lamy, may be held liable for violation of Barry Armstrong's constitutional right, because no § 1983 claim has been brought against the teacher himself.

### A. Statute of Limitation Applied to § 1983 Claim

In *Wilson v. Garcia*, 471 U.S. 261, 278, 105 S.Ct. 1938, 1948, 85 L.Ed.2d 254 (1985), the Supreme Court held that courts entertaining claims brought under § 1983 should borrow state statutes of limitation for personal injury actions. In *Owens v. Okure*, 488 U.S. 235, 249–50, 109 S.Ct. 573, 581–82, 102 L.Ed.2d 594 (1989), the Supreme Court

modified the rule to require courts to borrow the general or residual statute for personal injury actions when the forum state provides multiple statutes of limitation for personal injury actions.

Under Mass.Gen.L. ch. 260 § 2A, "actions of tort ... shall be commenced only within three years next after the cause of action accrues." The three-year period of limitation prescribed in Mass.Gen.L. ch. 260 § 2A governs these § 1983 claims.

■ Federal law applicable to § 1983 claims also borrows from state law the state's principles for tolling the limitation period. *Board of Regents of University of State of N.Y. v. Tomanio,* 446 U.S. 478, 483–86, 100 S.Ct. 1790, 1794–96, 64 L.Ed.2d 440 (1980). Under Mass.Gen.L. ch. 260 § 7, "if the person entitled thereto is a minor ... when a right to bring an action first accrues, the action may be commenced within the time hereinbefore limited after the disability is removed." Thus, in this case, if Barry Armstrong's claim accrued when he was a minor, the commencement of the three-year period would be deferred until he turned 18 years of age. *See e.g. Tindol v. Boston Housing Authority,* 396 Mass. 515, 487 N.E.2d 488 (1986) (if person is minor when cause of action first accrues, action may be brought within time fixed, in appropriate state statute of limitation, from the time minor reaches legal age).

■ The question before this court is whether Barry Armstrong brought his § 1983 claims within the three-year-period of limitation prescribed by Massachusetts law. The dispute focuses on when the three years began to run, which is also referred to as the time the claim accrued. Although the applicable limitation period is determined as a matter of state law, the *accrual* date of a § 1983 action is determined as a matter of federal law. *Lafont–Rivera v. Soler–Zapata,* 984 F.2d 1, 2–3 (1st Cir.1993); *Rivera–Muriente v. Agosto–Alicea,* 959 F.2d 349, 353 (1st Cir.1992); *Rodriguez Narvaez v. Nazario,* 895 F.2d 38, 41 n. 5 (1st Cir.1990).

■ Under the federal "discovery rule," § 1983 claims accrue when the plaintiff "knows or has reason to know of the injury which is the basis of the cause of action."

*Calero–Colon v. Betancourt–Lebron,* 68 F.3d 1, 3 (1st Cir.1995). *See also Attallah v. United States,* 955 F.2d 776, 780 (1st Cir. 1992) ("Where the injury and its cause are not immediately apparent, accrual of the cause of action occurs at the time the injury is discovered or when a claimant in exercise of reasonable diligence could have discovered it," citing *United States v. Kubrick* 444 U.S. 111, 121–25, 100 S.Ct. 352, 359–61, 62 L.Ed.2d 259 (1979) (discovery rule under Federal Tort Claims Act)); *Lavellee v. Listi,* 611 F.2d 1129, 1131 (5th Cir.1980) (in § 1983 action, "until the plaintiff is in possession of the 'critical facts that he has been hurt and who has inflicted the injury,' ... the statute of limitations does not commence to run," citing *Kubrick,* 444 U.S. at 122, 100 S.Ct. at 359).

■ If Barry Armstrong's § 1983 claim were against the alleged abuser based on the abusers' injury to his constitutional rights, the question regarding when Barry Armstrong knew or had reason to know of his injury under the federal discovery rule would be somewhat different from the question before this court now. The theory of Barry Armstrong's § 1983 claim against the Municipal Defendants is not that Barry Armstrong was sexually abused by any person among the Municipal Defendants, but that the Municipal Defendants created the circumstances under which another person, a teacher, sexually abused him. In other words, Barry Armstrong's § 1983 claim against the Municipal Defendants is that, if the Municipal Defendants had taken action to prevent teachers from abusing students, Michael Lamy would not have abused Barry Armstrong. The Municipal Defendants are liable, argue the plaintiffs, because they proximately caused the injury and violation of Barry Armstrong's constitutional rights, by failing to supervise and control Michael Lamy and by promulgating policies that permitted sexual abuse to flourish within the school system.

In the context of school sexual abuse cases, several district courts in other jurisdictions have held that the date the claim accrued against school officials was different from the date the claim accrued against the alleged

abuser, because a plaintiff could not reasonably be expected to know that the conduct of the school officials was a cause of the injury and violation of his or her constitutional rights. *See Doe v. Board of Educ. of Hononegah Community High School Dist. No. 207,* 833 F.Supp. 1366 (N.D.Ill.1993) (in § 1983 school sexual abuse case, motion to dismiss by school administrators on statute of limitation grounds was denied, because a minor student could not reasonably be expected to discover that the school administrators had caused her constitutional rights to be violated through their promulgation of policies that allowed sexual abuse to flourish, especially where plaintiff alleged that administrators concealed teacher's sexual misconduct of other students); *Doe v. Paukstat,* 863 F.Supp. 884 (E.D.Wis.1994) (in § 1983 school sexual abuse case against teacher and school district, summary judgment against the school district on the statute of limitation issue was denied where issues of disputed fact existed as to when student knew that she was injured by the school district's conduct of promulgating policies that fostered child abuse); *Sowers v. Bradford Area School Dist.,* 694 F.Supp. 125 (W.D.Pa.1988), *aff'd,* 869 F.2d 591 (3rd Cir.1989), *judgment vacated on other grounds, sub nom Smith v. Sowers,* 490 U.S. 1002, 109 S.Ct. 1634, 104 L.Ed.2d 150 (1989) (in § 1983 school sexual abuse case, motion to dismiss on statute of limitation grounds was denied, where further discovery and factual development was necessary in order to determine whether the plaintiff student knew or should have known that the school district, superintendent, principal, and assistant principal had fostered an environment of deliberate indifference toward teacher abuse of female students, and that such deliberate indifference was a proximate cause of the student's injury).

As in *Board of Educ. of Hononegah Community High School Dist. No. 207, Paukstat,* and *Sowers,* the evidence in this case does not indicate the date on which the plaintiff knew, or should have known, that the alleged acts and omissions on the part of the Municipal Defendants were a proximate cause of his injury, even assuming that he knew he had been injured by Michael Lamy. I conclude that summary judgment as to the § 1983 claim is not appropriate on the issue of the statute of limitation. I therefore move on to the merits of that claim.

## B. Supervisory Liability

Barry Armstrong has also asserted § 1983 claims against each of the individual Municipal Defendants in his or her individual capacity.

■■■ A superior officer cannot be held vicariously liable under § 1983 on a respondeat superior theory. *Monell v. Department of Social Services,* 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978); *Maldonado–Denis v. Castillo–Rodriguez,* 23 F.3d 576, 581 (1st Cir.1994). A supervisory official may, however, be held liable under § 1983 on the basis of his or her own acts or omissions. *Bowen v. City of Manchester,* 966 F.2d 13, 20 (1st Cir.1992). To succeed on any such claim of supervisory liability, a plaintiff must show deliberate or callous indifference to the constitutional rights of others and an "affirmative link" between "street-level misconduct and the action, or inaction, of the supervisory officials." *Gutierrez–Rodriguez v. Cartagena,* 882 F.2d 553, 562 (1st Cir.1989). Thus, to support a supervisory liability claim, plaintiffs must connect the supervisor's conduct to the subordinate's violative act or omission. *Maldonado–Denis,* 23 F.3d at 581.

The Fifth Circuit has held that a supervisory school official can be held personally liable for a subordinate's sexual abuse of a student, if the student establishes that:

(1) the defendant learned of facts or a pattern of inappropriate sexual behavior by a subordinate pointing plainly toward the conclusion that the subordinate was sexually abusing the student; and

(2) the defendant demonstrated deliberate indifference toward the constitutional rights of the student by failing to take action that was obviously necessary to prevent or stop the abuse; and

(3) that such failure [was a cause of] injury to the student [of constitutional dimension].

*Doe v. Taylor Independent School Dist.,* 15 F.3d at 451.

The Eighth and Tenth Circuits have formulated a somewhat different legal test, holding that school officials are subject to personal liability under § 1983 if:

 (a) the school officials

 (1) received notice of a pattern of unconstitutional acts of sexual abuse committed by subordinates, and

 (2) demonstrated deliberate indifference to or tacit authorization of the offensive acts, and

 (3) failed to take sufficient remedial action, and

 (b) their failure was a proximate cause of injury to the student.

*Larson by Larson v. Miller,* 76 F.3d 1446, 1453 (8th Cir.1996); *Jane Doe "A" by and through Jane Doe "B" v. Special School Dist. of St. Louis County,* 901 F.2d 642, 645 (8th Cir.1990); *Gates v. Unified School Dist. No. 449 of Leavenworth County, Kan.,* 996 F.2d 1035, 1041 (10th Cir.1993).

The Third Circuit has held that school officials may be held personally liable based upon "[t]heir own actions in adopting and maintaining a practice, custom or policy of reckless indifference to instances of known or suspected sexual abuse of students by teachers, in concealing complaints of abuse, and in discouraging students' complaints about such conduct." *Stoneking,* 882 F.2d at 724.

 ■■■■ In this case, I conclude that the plaintiffs have not proffered sufficient evidence to support a finding against any of the individual Municipal Defendants under any of the formulations of the legal test stated above. Plaintiffs have proffered no evidence that any of the Municipal Defendants "learned of facts … pointing plainly to the conclusion that [a] subordinate was sexually abusing [a] student." The fact that Michael Lamy walked in late on several occasions with Barry Armstrong past Principal O'Connor's office and "acknowledged" Principal O'Connor is not enough to support a reasoned inference that Principal O'Connor knew that Michael Lamy and Barry Armstrong were engaging in sexual contact.

Plaintiffs have proffered no evidence that any of the individual Municipal Defendants "received notice of a pattern" of sexual abuse. The assertion that the atmosphere at the Higgins Junior High School was like a "zoo" and that teachers and students "fraternized" is not enough to support a reasoned inference that any of the Municipal Defendants knew or should have known that any teacher was engaging in a pattern of sexually abusing students. Aside from two occasions on which Lamy and Armstrong are alleged to have engaged in secretive sexual contact on school grounds, all of the sexual contact is alleged to have occurred off of school property, either in Lamy's home, or in his car. Plaintiff has presented no evidence of complaints of sexual abuse by Barry Armstrong or any student, upon which any of the Municipal Defendants were called to take remedial action. Plaintiffs have presented no evidence that any of the Municipal Defendants concealed or discouraged complaints.

Courts that have allowed plaintiffs to maintain claims against school supervisory officials individually have required plaintiffs to proffer substantial evidence indicating deliberate indifference, far more than plaintiffs have proffered here. In *Doe v. Taylor Independent School Dist.,* 15 F.3d at 446, 456–57, the court denied summary judgment as to the personal liability of a school principal, where "it was no secret within the school community that [the teacher] behaved inappropriately toward a number of young female students," and the principal had received "a clear signal" of the sexual relationship when he received complaints about specific inappropriate sexual behavior on the part of the teacher toward specific students and had previously cautioned the teacher about specific acts. Likewise, in *Stoneking,* 882 F.2d 720, summary judgment was denied as to the personal liability of two supervisory officials who had received, repressed and concealed at least five complaints between 1978 and 1982, concerning sexual assaults of female students by teachers and/or staff members.

Courts have not allowed plaintiffs to maintain claims against school supervisory officials individually without evidence of deliberate indifference. For example, in *Stoneking,* 882 F.2d at 731, the court granted summary judgment for the school superintendent individually, where it was not possible to discern

from the record any affirmative acts by the superintendent on which plaintiff could base a claim of toleration, condonation or encouragement of sexual abuse by teachers.

In short, nothing in the record would support a reasoned finding that any of the individual Municipal Defendants knew of the alleged sexual abuse of Barry Armstrong or any other student, or was deliberately indifferent to Barry Armstrong's constitutional rights. I conclude that Principal Edward O'Connor, Superintendent Robert Ireland, and the seven members of the Peabody School Committee, individually, are each entitled to summary judgment as to the § 1983 claim in Count 28.

### C. Municipal Liability

Plaintiffs have asserted § 1983 claims against the City of Peabody and against each of the individual Municipal Defendants in his or her official capacity. A suit against an officer in his or her official capacity is simply another way of suing the public entity that the official represents. *Hafer v. Melo*, 502 U.S. 21, 25, 112 S.Ct. 358, 361, 116 L.Ed.2d 301 (1991).

A municipality cannot be held liable for a purported constitutional civil rights violation under ordinarily applicable principles of either vicarious liability or respondeat superior. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197, 1202, 103 L.Ed.2d 412 (1989); *Monell v. Department of Social Services of City of N.Y.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978). In order to establish municipal liability under § 1983, a plaintiff must establish that a municipal policy or custom was a cause of the alleged constitutional violation. *Manarite by and through Manarite v. City of Springfield*, 957 F.2d 953, 958 (1st Cir. 1992), *cert. denied* 506 U.S. 837, 113 S.Ct. 113, 121 L.Ed.2d 70 (1992). To establish a claim against a municipality on the basis of custom, a plaintiff must prove a practice so "permanent and well settled as to constitute a 'custom or usage' with the force of law." *Monell*, 436 U.S. at 691, 98 S.Ct. at 2036; quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

Only when the implementation of the municipality's policy or custom is a cause of the injury may the municipality be liable under § 1983. *Canton*, 489 U.S. at 385, 109 S.Ct. at 1202. A plaintiff must show "a direct link between the municipality's policy and the constitutional violation." *Bowen*, 966 F.2d at 18.

Only those municipal officials who have "final policymaking authority" may by their actions subject the municipality to § 1983 liability. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483, 106 S.Ct. 1292, 1300, 89 L.Ed.2d 452 (1986). Whether a particular official has "final policymaking authority" is a question of state law to be resolved by the trial judge. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123, 108 S.Ct. 915, 924, 99 L.Ed.2d 107 (1988); *Jett v. Dallas Independent School Dist.*, 491 U.S. 701, 737, 109 S.Ct. 2702, 2723, 105 L.Ed.2d 598 (1989). Under Massachusetts law, the school committee in each city, town and regional school district is responsible for "establish[ing] educational goals and policies for the schools in the district consistent with the requirements of law and statewide goals and standards established by the board of education." Mass. Gen.L. ch. 71 § 37. *See also McDuffy v. Secretary of Executive Office of Educ.*, 415 Mass. 545, 615 N.E.2d 516, 549 (1993) ("general charge" of the public schools in each town, city, or regional school district is assigned to a locally elected school committee in each community).

#### (1) Liability for failure to supervise

A local governmental entity can be found liable under § 1983 for a governmental custom of failing to supervise its employees to prevent or stop sexual misconduct, if the plaintiff proves both the existence of the official custom and that the custom was a cause of the claimed harm. Precedents support a statement of the applicable legal test as one requiring a plaintiff to show:

(1) that the governmental entity's employees engaged in a continuing, widespread, persistent pattern of conduct in violation of the constitutional standard,

(2) that the governmental entity's policy-making officials, after having notice of the misconduct, remained deliberately indifferent to or tacitly authorized continuation of that misconduct, and

(3) that the plaintiff was injured by continued misconduct within the persistent pattern, thus showing that the custom was a moving force behind the violation of the constitutional standard.

*See Gates,* 996 F.2d at 1041; *Larson,* 76 F.3d at 1453; *Thelma D. by and through Delores A. v. Board of Educ. of City of St. Louis,* 934 F.2d 929, 932 (8th Cir.1991); *Jane Doe "A" v. Special School Dist. of St. Louis County,* 901 F.2d at 646.

■ Plaintiffs have not proffered evidence sufficient to satisfy this legal test. As noted previously, aside from two occasions on which Lamy and Armstrong are alleged to have engaged in secretive sexual contact on school grounds, all of the sexual contact is alleged to have occurred off of school property, either in Lamy's home, or in his car. No other students are alleged to have engaged in sexual conduct with Michael Lamy or any other teacher. There is no evidence of the existence of any "continuing, widespread, persistent pattern" of sexual abuse by subordinates.

Plaintiffs have presented no evidence that the school committee (as the officials with final policymaking authority) showed "deliberate indifference to" sexual contact or manifested tacit·authorization of such misconduct after notice that it was occurring, because plaintiffs have presented no evidence that the school committee, or indeed *any* school supervisory official, knew of the alleged sexual contact between Barry Armstrong and Michael Lamy or any other students or teachers. They have presented *no* evidence of any complaints made to any school supervisory official by Barry Armstrong or any other person.

**(2) Liability for inadequate hiring policy**

■ To prove that a hiring policy violated his rights, Barry Armstrong must show that (1) the hiring procedures were inadequate; (2) the school officials were deliberately indifferent in adopting the hiring policy; and (3)

the inadequate hiring policy was a cause of his injury. *Benavides v. County of Wilson,* 955 F.2d 968, 972 (5th Cir.1992), *cert. denied,* 506 U.S. 824, 113 S.Ct. 79, 121 L.Ed.2d 43 (1992). An example of a successful claim appears in *Doe v. Hillsboro Independent School Dist.,* 81 F.3d 1395, 1402 (5th Cir. 1996). The court in *Hillsboro* held that the school officials' hiring policies and procedures were inadequate and caused violation of a student's constitutional rights when she was raped by a school custodian, after officials had failed to investigate criminal records of prospective employees, and had employed a school staff of which one third were convicted criminals.

■ Barry Armstrong has not met this burden. He has presented no evidence that the school's hiring policy had anything to do with Michael Lamy's alleged abuse of Barry Armstrong. The evidence is that Michael Lamy had no criminal record, and no record of complaints of sexual abuse, at the time he was hired to work at the Higgins Junior High School.

**(3) Liability for failure to train**

■ Failure to train may be a basis for municipal liability, but only if the failure to train reflects a "deliberate" or "conscious" choice by the municipality. *Canton,* 489 U.S. at 389, 109 S.Ct. at 1205. To establish liability of a local governmental entity under § 1983, for failure to adequately train employees to report and to prevent sexual abuse of students, a plaintiff must prove that the entity's failure to train its employees in a relevant respect evidenced deliberate indifference to rights of students.

■ One avenue for asserting a failure-to-train claim is to show a pattern of constitutional violations that puts the municipality on notice that its employees' responses to a regularly recurring situation are insufficient to measure up to the constitutional standard for protection of persons in the municipality. *Canton,* 489 U.S. at 397, 109 S.Ct. at 1209. As explained previously, plaintiffs have provided no evidence that the school committee, or any other school supervisory official, had either actual or constructive notice of the

inadequacy of its training program and then failed to take remedial steps.

Notice of a pattern of behavior in violation of the constitutional standard need not be shown to render a governmental entity liable under § 1983 for failure to train employees, however, if "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Canton*, 489 U.S. at 390, 109 S.Ct. at 1205. For example, in *Canton*, the Court noted that because police officers are armed by a municipality and the officers are certain to be required on occasion to use force in apprehending felons, "the need to train officers in the constitutional limitations on the use of deadly force can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." *Id.* at 390, n. 10, 109 S.Ct. at 1205, n. 10 (citation omitted).

The evidence in this case does not compare favorably with the example recited in *Canton*. Even if it were assumed that some need for training regarding sexual abuse or fraternization would have been obvious to ordinarily prudent school officials in the mid-1970's, plaintiffs have not proffered any evidence to support a finding that any purported failure to train teachers regarding sexual abuse or fraternization was a cause of injury to Barry Armstrong. A plaintiff must show that there is a causal link between the municipality's policy and the alleged violation. *Bowen*, 966 F.2d at 18.

I conclude that the City of Peabody and all of the Municipal Defendants in their official capacities, are entitled to summary judgment as to the § 1983 claim in Count 28.

## IV. Supplemental Jurisdiction over State Law Claims

In the absence of a valid § 1983 claim, at this point, plaintiffs can claim no independent basis for federal jurisdiction against the defendants. Plaintiffs cannot, at this point, claim diversity of citizenship under 28 U.S.C. § 1332(a)(1), because all of the Municipal Defendants and at least one of the Lamy Family Defendants are Massachusetts domiciliaries. Complete diversity cannot be shown.

This court may, however, exercise discretionary supplemental jurisdiction to decide the remaining state law claims under 28 U.S.C. § 1367(c)(3). It provides:

> The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if ... the district court has dismissed all claims over which it has original jurisdiction ...

In deciding whether to retain jurisdiction over lingering state-law claims, the court must take into account "concerns of comity, judicial economy, convenience, fairness, and the like." *Roche v. John Hancock Mutual Life Insurance Company*, 81 F.3d 249, 257 (1st Cir.1996). Dismissal may be appropriate if the federal-question claim is eliminated early in the proceedings. *Martinez v. Colon*, 54 F.3d 980, 990 (1st Cir.1995), *cert. denied*, — U.S. —, 116 S.Ct. 515, 133 L.Ed.2d 423 (1995). In an appropriate situation, however, a federal court may retain jurisdiction over state-law claims "notwithstanding the early demise of all foundational federal claims." *Rodriguez v. Doral Mortgage Corp.*, 57 F.3d 1168, 1177 (1st Cir.1995).

In this case, as in *Roche*, 81 F.3d at 257, the litigation has matured, discovery has been extensive, the summary judgment record is complete, and interests in both judicial economy and fairness all weigh in favor of this court's exercising discretion to retain jurisdiction over plaintiffs' remaining state-law claims. I proceed to analyze the state law claims.

## V. Statute of Limitation Applied to State Law Claims

The remaining claims in the case are all state-law claims. Each of these state-law claims depends upon legal and factual issues bearing upon the application of a statute of limitation under Massachusetts law.

As explained in Part III.A, under Massachusetts law, the limitation period for a cause of action for tortious conduct is three years from the date the action accrues. Mass. Gen.L. ch. 260 § 2A. If the plaintiff is a minor when the action accrues, the com-

mencement of the limitation period is deferred until the age of majority. Mass. Gen.L. ch. 260 § 7. The question now before this court is whether plaintiffs brought their state tort claims within the three-year limitation period prescribed by Massachusetts law. The dispute once again focuses on when the three years began to run, or, as commonly phrased, when the claim *accrued.*

Plaintiffs argue that the cause of action did not accrue and the three-year period did not commence to run until Barry Armstrong, in his own mind, in October 1992, made the causal connection between the earlier sexual contact and his later severe psychological and physical manifestations. Thus, they argue, plaintiffs' filing in July, 1994 was timely. Defendants, on the other hand, contend that the cause of action accrued at the time of the sexual contact when Barry Armstrong was a minor, that tolling was in effect until he reached age 18, and that the three-year limitation period ended when he reached age 21, on June 24, 1981. On this basis, defendants argue that plaintiffs' filing thirteen years later in July, 1994, was untimely.

 Under Massachusetts law, the court applies a "discovery rule," under which the limitation period does not begin to run until the plaintiff has "(1) knowledge or sufficient notice that [he] was harmed and (2) knowledge or sufficient notice of what the cause of the harm was." *Bowen v. Eli Lilly & Co.,* 408 Mass. 204, 557 N.E.2d 739, 742 (1990). "One need not apprehend the full extent or nature of an injury in order for a cause of action to accrue." *Riley v. Presnell,* 409 Mass. 239, 565 N.E.2d 780, 784 (1991), citing *Olsen v. Bell Telephone Laboratories, Inc.,* 388 Mass. 171, 445 N.E.2d 609, 612 (1983) (cause of action accrues on discovery of any injury rather than on discovery that injury is permanent). The statute of limitation starts to run "when an event or events have occurred that were reasonably likely to put the plaintiff on notice that someone may have caused her injury." *Bowen,* 557 N.E.2d at 741.

In *Riley v. Presnell,* 409 Mass. 239, 565 N.E.2d 780 (1991), the court addressed the applicability of the Massachusetts discovery rule in the context of sexual abuse. *Riley*

involved a malpractice claim against a psychiatrist. Specifically, the plaintiff claimed that the psychiatrist committed malpractice when he introduced alcohol, marijuana, and sexual activity into the psychiatric sessions under the guise that these were legitimate treatment methods. *Riley,* 565 N.E.2d at 783. Riley was uncomfortable with the sexual activity and after the second or third incident refused to participate further. *Id.* Nonetheless, Riley apparently became totally dependent on the psychiatrist, stating the opinion that he might be "God." The psychiatrist told Riley not to tell anyone of the nature of the therapy because it was "special" and the world would neither understand nor approve. *Id.*

After the therapist abruptly ended the therapy, Riley began therapy with a new psychiatrist the following year, who told him that the first psychiatrist's "treatment" was totally inappropriate. Riley, however, still did not realize until four years later, when he first met another former patient of the first psychiatrist, that there was a causal link between his psychological condition and the treatment he had received from the first psychiatrist. The trial court held that Riley's claim was barred by the three-year statute of limitation.

In analyzing the statute-of-limitation problem, the Supreme Judicial Court in *Riley* held the plaintiff to the standard of a reasonable person who has been subjected to the conduct that serves as the basis for the plaintiff's complaint:

> If . . . an initially reasonable person would, by reason of the experience forming the basis for the plaintiff's complaint, have his or her judgment altered in some way, such altered judgment becomes the standard. The cause of action will not accrue until such an individual would have discovered the damage. In other words, if the defendant's conduct would, in an ordinary reasonable person, cause an injury which by its very nature prevents the discovery of its cause, the action cannot be said to have accrued. The accrual of the cause of action occurs when the reasonable person who had been subject to the experience

would have discovered that the injury was caused by that experience. *Riley*, 565 N.E.2d at 786. Finding that "an injury to the mind could interfere with the discovery of the cause of action," and that a "reasonable fact finder ... could find that Riley did not make the causal link and that his failure to do so was reasonable," *id.* at 786, the court held that summary judgment for the defendant psychiatrist had been improperly granted and reversed the trial court's judgment.

In this case, a dispute of fact exists as to whether and to what extent Barry Armstrong repressed his memory of the sexual contact, from the time of the sexual contact until he saw his son in a school play in October of 1992. I conclude, however, that this dispute is not material.

 Under the Massachusetts discovery rule, "The delayed knowledge may be either the fact of the injury ... or the cause of the injury." *Cambridge Plating Co., Inc. v. Napco, Inc.*, 991 F.2d 21, 25 (1st Cir.1993). In a "repressed memory" case, the plaintiff lacks conscious memory of the sexual contact and therefore lacks current comprehension of the harm and its cause. *See e.g. Hoult v. Hoult*, 792 F.Supp. 143, 145 (D.Mass.1992) (summary judgment for defendant denied where plaintiff had no memory of sexual abuse until after the expiration of the statute of limitation). "Repressed memory," however, is not necessary to overcome the statute-of-limitation bar under Massachusetts law. In *Riley*, the plaintiff always remembered the sexual contact and did not claim repressed memory. In a case not involving "repressed memory," accrual of the action does not occur until a "reasonable person who had been subject to the experience would have discovered that injury was caused by that experience." *Riley*, 565 N.E.2d at 786. Defendants have not shown the absence of a genuine dispute of material fact as to whether a reasonable person who was subjected to the experience of Barry Armstrong would have discovered that injury was caused by Michael Lamy's conduct.

I conclude that in this case, as in *Riley*, a finder of facts could reasonably find that a reasonable thirteen-to-fifteen-year-old boy

who has been "subjected to the condition that forms the basis for the plaintiff's complaint," might have his judgment altered by the defendant's conduct. The defendant's conduct could, in a reasonable thirteen-to-fifteen-year-old boy, cause an injury that by its very nature prevents the discovery of its cause.

The proffered evidence in Barry Armstrong's case is similar to that in *Nault v. New England Annual Conference of the United Methodist Church*, Suffolk County Superior Court, Commonwealth of Massachusetts, Civil Action No. 95–03457 (June 14, 1996) (Hinkle, J.) (Docket No. 76, Ex. B). In *Nault*, the court denied the defendants' summary judgment motions in a case brought by a woman who was fourteen at the time she was sexually abused by a minister in her church. The court held that the record raised an issue of material fact as to when the plaintiff knew or should have known of her injury, where a finder of fact might find that at the time of the sexual abuse she was unaware of the wrongfulness of the sexual contact, considered the relationship with the minister to be a boyfriend-girlfriend relationship, and felt as though she was a "coconspirator" with her abuser. The plaintiff testified that she did not believe she had been harmed by the minister's actions at the time, and that it was not until many years later that she experienced any emotional harm at all. Although the plaintiff was in therapy during and after the incidents of sexual abuse, the sexual abuse was never a focus of the therapy. The record was sufficient to support a finding that the plaintiff was unable to make the causal connection between her sexual abuse and the psychological harm she suffered until years later when she became aware through the news media of incidents involving sexual abuse by Catholic Priest Father James Porter.

A finder of facts could reasonably find that, like the plaintiff in *Nault*, Barry Armstrong, at the time of the alleged sexual contact, considered his relationship with Michael Lamy to be an intimate personal relationship. The undisputed evidence is that throughout the time that Barry Armstrong was in junior high school he participated and performed in school plays that were directed

by Michael Lamy, seeing Michael Lamy on almost a daily basis. They were often alone together at school and on the school's premises and Barry Armstrong slept over at the Lamy Family home on numerous occasions. They had numerous instances of sexual contact during the course of a sixteen-month period. The evidence would also support findings that, at the time the sexual contact was occurring, Barry Armstrong "enjoyed" the contact, that it did not upset him or bother him, because he "really had no sexual contact at thirteen [so he] had nothing to compare it to," that he "enjoyed the attention" from Michael Lamy, "admired" Michael Lamy, and considered Michael Lamy his "mentor," and that his parents also "liked" and "looked up to" Michael Lamy.

Defendants argue that Barry Armstrong's experience of feeling "uncomfortable," "scared," and "nervous" at the time of the sexual contact, having insomnia during the time period of the sexual contact, feeling pain from his arm being gripped, and feeling sore for one day after attempted intercourse, constitute enough injury, as a matter of law, to put Barry Armstrong on notice, at the time of the sexual contact, that he had been injured and by whom. I conclude that I cannot so determine on the record before me. A genuine dispute of material fact is presented.

Defendants place great weight on the fact that Barry Armstrong was "uncomfortable" with certain aspects of the sexual contact with Michael Lamy, and that plaintiff turned away and refused to allow these acts. In *Riley*, the adult plaintiff also was "uncomfortable" with the sexual conduct and after the second or third incident refused to participate any further. Similarly, in this case, any evidence that Barry Armstrong was "uncomfortable" or refused to participate in some aspect of the sexual contact, is not enough to support a decision, as a matter of law, that he suffered an "injury," or to determine that beyond genuine dispute Barry Armstrong knew or should have known he had been harmed.

Defendants also stress the fact that Barry Armstrong stated he was "scared" and "nervous" at the time of the sexual contact. Barry Armstrong specifically stated in his depo-

sition that he was "nervous" and "scared" during the first occasion of sexual contact because it was "new" and "different," and that later the sexual contact became "routine." The fact that on the first occasion of sexual contact he was "nervous," and "scared," does not necessarily mean that he knew or should have known that Michael Lamy had caused him injury. Also, the fact that Barry Armstrong did not sleep well during the time period of the sexual contact does not necessarily mean that he was or should have been aware of "injury" from the sexual contact. A finder of fact could reasonably find that Barry Armstrong, a child at the time, was simply nervous about the "new" and "different" experience of sexual contact with his adult teacher, whom he "admired" and considered his "mentor," and that he was not aware of any "injury."

Similarly, the fact that Barry Armstrong felt physical pain when Michael Lamy squeezed his arm, and felt sore for one day after attempted intercourse, does not change the character of the overall relationship between Barry Armstrong and his teacher. In the context of Michael Lamy's alleged ongoing course of conduct with Barry Armstrong, a finder of fact could reasonably find that these fleeting moments of physical pain were not perceived by Barry Armstrong at the time as "injury," but instead were perceived as a normal part of his relationship with his adult teacher.

Defendants cite several Massachusetts sexual abuse cases in which a plaintiff was barred by the statute of limitation when the plaintiff knew, at the relevant time, that he or she was harmed to some degree, although not knowing the full extent of the harm. In each case, however, the evidence indicating the plaintiff's knowledge of injury was far more extensive than that involved here.

For example, in *Phinney v. Morgan*, 39 Mass.App.Ct. 202, 654 N.E.2d 77, 80–82 (1995), *rev. den.*, 421 Mass. 1104, 656 N.E.2d 1258 (1995), the court held that two adult daughters who brought an action against their mother for failing to protect them during childhood from sexual abuse by their father, knew or should have known more than three years before instituting their ac-

tion that they were harmed. The court based its decision on the facts that the daughters admitted that during their minority, they complained about the father's conduct to the mother, one daughter reported the abuse to a youth counselor and previously discussed bringing suit, and another daughter testified that she ran away from home three times to escape the abuse, and that she grew up feeling that she was an orphan and had no one to protect her.

In *Palermo v. Brennan*, Suffolk County Superior Court, Commonwealth of Massachusetts, Civil Action No. 92–1083, 1994 WL 879707 (July 28, 1994 and 1994 WL 879704, August 31, 1994) (Doerfer, J.) (Docket No. 54, Ex. B), the court granted summary judgment for defendant on the basis of the statute of limitation in a case involving alleged sexual abuse by a psychiatrist, even though the plaintiff submitted an affidavit stating that she did not realize until years later that the sexual activity was the cause of her emotional harm. The court based the decision on the facts that the plaintiff admitted that she always felt that the therapy provided by the therapist was "awful," that she was "traumatiz[ed]" by one meeting in which the therapist ejaculated while wearing his suit, an incident that she found "very disturbing," that she realized many years before filing her claim that her relationship with the therapist was part of the cause of her anxiety at that time, and that during the time she was sexually involved with the therapist, she felt she was living a "secret life" and felt a "distance from people."

In *Szymczuk v. Szymczuk*, Middlesex County Superior Court, Commonwealth of Massachusetts, Civil Action No. 92–3581 (March 4, 1996) (Gershengorn, J.) (Docket No. 76, Ex. A), the court held, notwithstanding the discovery rule, a plaintiff was barred by the statute of limitation in her claim against her uncle for sexually abusing her during childhood, where plaintiff, more than three years before filing her claim, reported the sexual abuse to mental health professionals, asked for a family meeting regarding incest issues, attended group therapy to work out the incest issues, described painful memories to her therapist of being in bed with her uncle, and expressed to her therapist her dislike and distrust of her uncle.

In *Flanagan v. Grant*, 79 F.3d 1 (1st Cir. 1996), the court held that, notwithstanding the Massachusetts discovery rule, a daughter had sufficient notice that sexual abuse by her father was the cause of harm, and her claim was thus barred by the statute of limitation, where more than three years before she brought her claim, the daughter filed, withdrew, and later refiled criminal charges against the father, had suicidal inclinations linked in her affidavit with going to the police, manifested a strong desire to escape the abuse, and, in the opinion of her psychologist, intellectually recognized her injuries from the incest, even if she did not fully comprehend the extent of the harm caused.

In each of these cases, the plaintiff's knowledge of injury was much more extensive than that involved in Barry Armstrong's case. In this case, genuinely disputed issues of material fact remain as to whether Barry Armstrong's experience as a child of engaging in sexual contact with his teacher did or should have put him on notice, at the time of the contact, that Michael Lamy had caused him injury. I conclude that the action cannot now be determined to have accrued early enough for the limitation bar to be imposed as a matter of law. I cannot determine on the record before me that a finder of fact could not reasonably find that Barry Armstrong did not discover, and could not reasonably have been expected to discover, that he had been subjected to *any* injury by Michael Lamy, until October 1992, when Barry Armstrong claimed to have discovered the causal link between his later psychological and physical manifestations and the earlier sexual contact with Michael Lamy.

I conclude that under Massachusetts law, summary judgment as to the state-law claims is not appropriate on the issue of the statute of limitation. I move on to the merits of the state-law claims against the defendants.

### VI. Massachusetts Civil Rights Act Claim Against Municipal Defendants (Count 28)

Plaintiffs have brought a claim against each of the Municipal Defendants under the

Massachusetts Civil Rights Act ("MCRA"). The MCRA provides a cause of action

> whenever any person or persons, whether or not acting under color of law, interfere by threats, intimidation or coercion, or attempt to interfere by threats, intimidation or coercion, with the exercise or enjoyment by any other person or persons of rights secured by the constitution and laws of the United States, or of rights secured by the constitution or laws of the commonwealth.

Mass.Gen.L. ch. 12 § 11H.

▮ Under the MCRA (contrary to the rule under its federal counterpart, 42 U.S.C. § 1983) the violation element of the legal test for liability is not satisfied unless a claimant also proves that the violation was accomplished by threats, intimidation, or coercion. *See Sena v. Commonwealth*, 417 Mass. 250, 629 N.E.2d 986, 993 (1994); *Nicholas B. v. School Committee of Worcester*, 412 Mass. 20, 587 N.E.2d 211, 213 (1992); *Curran v. City of Boston*, 777 F.Supp. 116, 122 (D.Mass.1991).

The Massachusetts Supreme Judicial Court has defined "threats" as "acts or language by which another is placed in fear of injury or damage," "intimidation" as "creation of fear to compel conduct," and "coercion" as "the active domination of another's will." *Willitts v. Roman Catholic Archbishop of Boston*, 411 Mass. 202, 581 N.E.2d 475, 480 n. 10 (1991), citing *Delaney v. Chief of Police of Wareham*, 27 Mass.App.Ct. 398, 539 N.E.2d 65, 72 (1989); *Sena*, 629 N.E.2d at 994 n. 10. By requiring threats, intimidation or coercion, the Massachusetts Legislature did not manifest an intent "to create a vast constitutional tort." *Deas v. Dempsey*, 403 Mass. 468, 530 N.E.2d 1239, 1241 (1988).

▮ As a matter of law, I conclude plaintiffs have proffered no evidence that would support a finding that failure of the Municipal Defendants to supervise, train, regulate, discipline, or control Michael Lamy amounted to threats, intimidation or coercion. *Hathaway v. Stone*, 687 F.Supp. 708, 711 (D.Mass.1988) (failure to train, discipline, or supervise does not involve threats, intimidation or coercion); *Gross v. Bohn*, 782 F.Supp. 173, 185 (D.Mass.1991) (same); *Cur-*

*ran*, 777 F.Supp. at 122 (failure to train is not sufficient to state a claim under MCRA). Likewise, plaintiffs have proffered no evidence that would support a finding that the failure of the Municipal Defendants to promulgate adequate guidelines for proper behavior as a school teacher amounted to threats, intimidation or coercion. *See Rodriques v. Furtado*, 410 Mass. 878, 575 N.E.2d 1124, 1131 (1991) (policy of allowing police officers to seek warrants without authorization of supervisors does not constitute threats, intimidation or coercion).

▮ In short, plaintiffs have presented no evidence sufficient to make out a claim under the MCRA based on any acts of the Municipal Defendants. Nor can the Municipal Defendants be held liable for any alleged threats, intimidation or coercion of Barry Armstrong by Michael Lamy, because the doctrine of respondeat superior does not apply to an action brought under the MCRA. *Lyons v. National Car Rental Systems, Inc.*, 30 F.3d 240, 247 (1st Cir.1994).

I conclude that the City of Peabody, Robert Ireland, Edward O'Connor, and the seven members of the school committee are entitled to summary judgment as to the Massachusetts Civil Rights Act claim in Count 28.

## VII. Common-law Tort Claims Against Municipal Defendants

### A. Negligence Claims Against Municipal Defendants Individually (Counts 18–27)

In Counts 18 through 27, plaintiffs have brought ten common-law negligence claims against each of the individual Municipal Defendants (the principal, superintendent, and seven school committee members), including claims for negligence, negligent supervision, negligent training, and negligent hiring.

▮ These individual Municipal Defendants are protected from suit under the Massachusetts Tort Claims Act, Mass.Gen.L. ch. 258 § 2 ("MTCA"). The MTCA provides that

> [n]o ... public employee or the estate of such public employee shall be liable for any injury or loss of property or personal injury or death caused by his negligent or

wrongful act or omission while acting within the scope of his office or employment. . . .

The MTCA thus protects a "public employee" from negligence claims arising out of his or her office or employment. *Consolo v. George,* 835 F.Supp. 49 (D.Mass.1993). Plaintiffs have proffered no evidence that would support a finding that any individual Municipal Defendant was acting outside the scope of employment with regard to the alleged acts or omissions claimed by plaintiffs.

I conclude that Robert Ireland, Edward O'Connor and the seven members of the school committee are entitled to summary judgment as to the common-law negligence claims in Counts 18 through 27.

## B. Common–Law Tort Claims Against City of Peabody (Counts 15–17)

Plaintiffs have brought three common-law negligence claims against the City of Peabody. Count 15 alleges that the City of Peabody negligently violated "its duty to protect the Plaintiff Barry Armstrong." Count 16 alleges that the City of Peabody negligently "failed to train, supervise, regulate, or otherwise control the behavior of the Defendant Michael Lamy." Count 17 alleges that the City of Peabody negligently "failed to take reasonable measures to correct the behavior of the Defendant Michael Lamy."

### (1) Massachusetts Tort Claims Act protections against accountability

The City of Peabody is liable, under certain circumstances, for the negligence of its employees. The Massachusetts Tort Claims Act provides:

Public employers shall be liable for injury or loss of property or death caused by the negligent or wrongful act or omission of any public employee while acting within the scope of his office or employment, in the same manner and to the same extent as a private individual under like circumstances. . . .

Mass.Gen.L. ch. 258 § 2.

Effective January 14, 1994, the state legislature amended Mass.Gen.L. ch. 258, by adding §§ 10(e) through 10(j). The Supreme Judicial Court has held the amendments retroactively applicable to "all claims upon which a final judgment has not entered, or as to which an appeal is pending or the appeal period has not expired, and to all claims upon which suit is filed after the effective date of this act." *Carleton v. Town of Framingham,* 418 Mass. 623, 640 N.E.2d 452, 455–57 (1994). Since the claim in this case is one upon which a final judgment has not entered, § 10(j) applies retroactively here. The question before the court is whether § 10(j) bars plaintiffs' claims.

Section 10(j) bars claims made against municipalities based on

an act or failure to act to prevent or diminish the harmful consequences of a condition or situation, including the violent or tortious conduct of a third person, which is not originally caused by the public employer or any other person acting on behalf of the public employer.

Mass.Gen.L. ch. 258 § 10(j).

### (2) Municipal liability for alleged negligent acts of public employees other than Michael Lamy

Few reported decisions have anything to say about how to determine whether or not a condition or situation was "originally caused by the public employer or any other person acting on behalf of the public employer." The reported cases do have in common the idea that in order that a claim not be barred by § 10(j), the claim must involve "*something more* than the pure failure to alleviate a private harm" and that to be successful a claimant must show "*some* involvement of a public employee in creating the initial injury-causing scenario, not simply a failure to respond adequately after it arises." Joseph W. Glannon, Liability for "Public Duties" Under the Tort Claims Act: The Legislature Reconsiders the Public Duty Rule, 79 Mass.L.Rev. 17, 26 (1994).

In *Pallazola v. Town of Foxborough,* 418 Mass. 639, 640 N.E.2d 460 (1994), the SJC held that § 10(j) applied to bar a football fan's claim against a town based on the town's failure to provide sufficient police protection and its failure to prevent unlawful removal of a portion of an aluminum goal

post from the stadium, after fans, carrying a portion of the goalpost, caused it to come into contact with a high-voltage power line.

In *Bonnie W. v. Commonwealth,* 419 Mass. 122, 643 N.E.2d 424 (1994), a woman who was raped by a parolee employed as a maintenance man at her trailer park, brought a claim against the Commonwealth, based in part on the theory that a parole officer, who failed to meet with a parolee once per month, was negligent in failing to supervise the parolee. The Supreme Judicial Court held that § 10(j) barred the claim based on negligent supervision.

In *McConnell v. Dooling,* Norfolk County Superior Court, Commonwealth of Massachusetts, Civil Action No. 941503, 1995 WL 809504 (June 7, 1995) (Brady J.) (Docket No. 44, Ex. 12), the court held that § 10(j) barred claims against a public housing authority based on negligent supervision of a private security guard who assaulted the plaintiff. The court in *McConnell* cited, as persuasive precedent, Justice O'Connor's concurrence in *Cyran v. Town of Ware,* 413 Mass. 452, 597 N.E.2d 1352, 1360 (1992) (a decision predating the enactment of § 10(j)), stating that public employers should not be liable for situations "in which the plaintiff has been harmed by a condition or situation which was not originally caused by the public employee, and is attributable to the employee only in the sense that the employee failed to prevent or mitigate it."

■ Each of the reported decisions made a distinction between the failure to alleviate or respond to a private harm, and the action of a public employee in initially creating the injury-causing circumstance. The distinction applies to the case now before this court. Plaintiffs have based their negligence claims against the City of Peabody on the ground that city employees failed to "protect" Barry Armstrong, and failed to "train," "supervise," "regulate," "control," or "correct" Michael Lamy. I conclude that these claims are all claims based on the failure to prevent or mitigate a harm, rather than participation in the initial injury-causing circumstance. These claims fall within the scope of § 10(j), as construed by Massachusetts precedents; thus § 10(j) bars the plaintiffs from asserting a claim against the City of Peabody for the negligent acts of public employees other than Michael Lamy.

**(3) Municipal liability for Michael Lamy's alleged negligent acts**

One circumstance of this case was not present in any of the Massachusetts cases discussed above. *Pallazola, Bonnie W.,* and *McConnell* all involved a public employee's alleged failure to prevent harm by, or failure to supervise or control, *private* actors. In this case, the actor, Michael Lamy, was *himself* a public employee. Plaintiffs have not argued that the City of Peabody should be held liable under the MTCA for any of the alleged negligent conduct of Michael Lamy as a public employee; nonetheless, I address this issue to determine whether I can, on the record before me, rule out any liability of the City of Peabody on this basis.

■ Plaintiffs have alleged that Michael Lamy committed negligent acts or omissions by negligently failing to fulfill his duty of care toward Barry Armstrong (Count One), negligently failing to obtain professional treatment for his psychological disorder of uncontrollable urges to molest children (Count Two), negligently failing to remove himself from having responsibility for care and control of children (Count Three), and negligently inflicting emotional distress on Barry Armstrong (Count Seven). Plaintiffs also allege that Michael Lamy intentionally harmed Barry Armstrong. Under the MTCA, however, public employers are not liable for intentional torts committed by public employees. *Spring v. Geriatric Authority of Holyoke,* 394 Mass. 274, 475 N.E.2d 727, 734 (1985).

■ The MTCA provides that public employers are subject to liability in some circumstances for injuries caused by the negligence of a public employee while "acting within the scope of his office or employment." Mass.Gen.L. ch. 258 § 2. Thus, in determining whether the City of Peabody may be held liable on a claim that Michael Lamy was negligent as a public employee, I must determine whether plaintiffs have proffered evidence sufficient to support a finding that

negligence of Michael Lamy, causing harm to Barry Armstrong, occurred "within the scope of his office or employment."

The Supreme Judicial Court recently had occasion to consider the meaning of the phrase "acting within the scope of his office or employment," as that phrase is used in § 2 of the MTCA. *Clickner v. City of Lowell*, 422 Mass. 539, 663 N.E.2d 852 (1996). The Court looked to the common-law test of scope of employment, holding that

> The common law test considers whether the act was in furtherance of the employer's work ... Factors to be considered include whether the conduct in question is of the kind the employee is hired to perform, whether it occurs within the authorized time and space limits, and whether it is motivated, at least in part, by a purpose to serve the employer.

*Clickner*, 663 N.E.2d at 854 (quoting *Wang Laboratories, Inc. v. Business Incentives, Inc.*, 398 Mass. 854, 501 N.E.2d 1163 (1986)). *See also Pinshaw v. Metropolitan Dist. Com'n*, 402 Mass. 687, 524 N.E.2d 1351, 1356 (1988).

In applying this test to the facts of this case, I note that the only proffered evidence tending to support a finding that Michael Lamy was acting in the scope of employment is evidence that some of his alleged negligent acts and omissions occurred within the authorized time and space limits of his performance of duties of his employment. At least two incidents of sexual contact occurred on school property.

Undisputed facts that weigh against a finding that Michael Lamy was acting in the scope of his employment are so compelling that no finder of fact could reasonably find on the evidence before the court that Michael Lamy was acting in the scope of his employment. Most of the sexual contact with Barry Armstrong occurred while Michael Lamy was acting as a private citizen, off duty, on his own time, in his own home and automobile. Michael Lamy's sexual contact with Barry Armstrong cannot reasonably be said to be in any material way associated with the work he was hired to perform for the City of Peabody as a music teacher at the Higgins Junior High School. Nor could the sexual

contact be found, on any basis reasoned from the evidence in this case, to be motivated, in any part, by a purpose to serve his employer. *See Doe v. Purity Supreme, Inc.*, 422 Mass. 563, 664 N.E.2d 815, 819 (1996) (rape and sexual assault were not within the scope of an assistant store manager's employment, and thus his employer was not vicariously liable to another employee who was allegedly raped and sexually assaulted by the manager); *O'Connell v. Chasdi*, 400 Mass. 686, 511 N.E.2d 349 (1987) (employee who sexually harassed a coemployee was not "furthering the interests of the employer.")

 It is true that "[t]he fact that the predominant motive of the [employee] is to benefit himself does not prevent the act from coming within the scope of employment as long as the act is otherwise within the purview of his authority," *Wang Laboratories, Inc.*, 501 N.E.2d at 1166. Nevertheless, in this case it cannot reasonably be said that the negligent acts allegedly involved in the sexual abuse of a minor student are acts "within the purview" of a teacher's authority. I conclude that Michael Lamy's alleged negligent acts and omissions involved in his sexual contact with Barry Armstrong were not acts "within the scope of his office or employment," and therefore, the City of Peabody cannot be held liable under the MTCA on the basis of Michael Lamy's negligent acts and omissions.

**(4) Municipal liability for negligent hiring**

 Section § 10(j) of the MTCA does not bar plaintiffs' claim against the City of Peabody based on the school committee members' alleged act of negligent hiring. *See McConnell v. Dooling*, Norfolk County Superior Court, Commonwealth of Massachusetts, Civil Action No. 941503, 1995 WL 809504 (June 7, 1995) (Brady, J.) (Docket No. 44, Ex. 12) (§ 10(j) does not bar claim of negligent hiring by not checking the defendant's criminal record; jury could conclude that negligent hiring was "participat[ion] in risk-creating conduct which contributed to the situation which caused the harm."); *Bonnie W. v. Commonwealth*, 419 Mass. 122, 643 N.E.2d 424 (1994) (§ 10(j) did not bar a rape

victim's claim based on a parole officer's contribution to the injury by negligently recommending the attacker's continuing employment at the trailer park where the victim lived and by misrepresenting the attacker's criminal history to the park management, because the parole officer "[took] action that exposed the plaintiff to risk").

 Although § 10(j) does not bar plaintiffs' negligent hiring claim, that claim nonetheless fails on the merits. A claim for negligent hiring requires evidence that the employer failed to exercise due care in the selection of an employee, evidence that the employer knew or should have known that the employee who was hired was unfit and posed a danger to others who would come into contact with the employee during the employment, and evidence that the employer's failure proximately caused the injury of which the plaintiff complains. *See Foster v. Loft, Inc.,* 26 Mass.App.Ct. 289, 526 N.E.2d 1309, 1311 (1988), *rev. granted,* 403 Mass. 1102, 529 N.E.2d 1345 (1988); *Ellingsgard v. Silver,* 352 Mass. 34, 223 N.E.2d 813, 817 (1967). Plaintiffs have presented no evidence, whatsoever, that there was any criminal record or past sexual misconduct with students of which the Municipal Defendants were, or should have been, aware. I conclude that plaintiffs have failed to proffer any evidence to support a finding essential to a claim that the City of Peabody is liable for any alleged negligent hiring.

The City of Peabody is entitled to summary judgment as to the negligence claims in Counts 15, 16, 17.

## C. Loss of Consortium Claim Against Municipal Defendants (Count 29)

In Count 29, plaintiff Kim Armstrong brought a loss-of-consortium claim against all defendants, including the municipal defendants, claiming that "as a direct and proximate result of all the Defendants' actions, [she] has lost the companionship, services and consortium of the Plaintiff Barry Armstrong."

 As a general rule, a claim for loss of consortium by one spouse requires proof of a tortious act that caused personal injury

to the other spouse. *See Agis v. Howard Johnson Co.,* 371 Mass. 140, 355 N.E.2d 315 (1976); *Diaz v. Eli Lilly & Co.,* 364 Mass. 153, 302 N.E.2d 555 (1973); *Mouradian v. General Elec. Co.,* 23 Mass.App.Ct. 538, 503 N.E.2d 1318 (1987), *rev. denied,* 399 Mass. 1105, 507 N.E.2d 1056 (1987); *Sena v. Commonwealth,* 417 Mass. 250, 629 N.E.2d 986 (1994): One spouse's claim for loss of consortium is a separate claim from that of the other spouse for personal injury, but a prerequisite of the consortium claim is that the injured spouse have a valid claim. *Sena,* 629 N.E.2d at 994.

 Having determined that Barry Armstrong has not proffered sufficient evidence to state a claim against any of the Municipal Defendants under federal civil rights law, state civil rights law, or common-law negligence theories, I conclude that Kim Armstrong's loss of consortium claims against the Municipal Defendants fail. *See also Tauriac v. Polaroid Corp.,* 716 F.Supp. 672, 673 (D.Mass.1989) ("The spouse of an alleged federal civil rights victim is not permitted an ancillary cause of action for loss of consortium").

I conclude that each of the Municipal Defendants is entitled to summary judgment as to the loss of consortium claim in Count 29.

## VIII. Common–Law Tort Claims Against the Lamy Family Defendants (Counts 9–14)

Plaintiffs have brought several common-law tort claims against the Lamy Family Defendants. Plaintiffs allege in Counts 9, 10, 11, 12, 13, and 14 that Cecilia Lamy (Michael Lamy's mother), as owner of the Lamy home where some of the sexual contact took place, and Michael Lamy's siblings, Thomas Lamy, Philip Lamy, and Catherine (Lamy) Puzzo, as occupiers of the premises, negligently failed to protect Barry Armstrong, negligently inflicted emotional distress, and intentionally inflicted emotional distress.

### A. Legal Duty of Family Members

 The plaintiffs' claims against the Lamy Family Defendants present an issue as to the existence of a legal duty in these circumstances. Under Massachusetts law,

the issue of legal duty is ordinarily for the court to decide as matters of law are decided. *Yakubowicz v. Paramount Pictures Corp.,* 404 Mass. 624, 536 N.E.2d 1067, 1070 (1989).

Under Massachusetts law, "a social host does not have a duty to protect third persons from criminal acts of a social guest in the absence of events that would lead a reasonable host to anticipate danger." *Apple v. Tracy,* 34 Mass.App.Ct. 560, 613 N.E.2d 928, 929 (1993) (homeowner whose house-guest had been released from prison following conviction for sexual assault of a child did not have duty to warn neighborhood parents and local police about the presence of the guest in their home, and could not be held liable when the guest sexually assaulted a child), *rev. denied,* 416 Mass. 1102, 618 N.E.2d 1364 (1993). *See also Husband v. Dubose,* 26 Mass.App.Ct. 667, 531 N.E.2d 600, 603 (1988) (social host owed no duty to social guest to protect her from unforeseen and unanticipated knife attack by another guest), *rev. denied,* 404 Mass. 1102, 536 N.E.2d 612 (1991).

This principle extends to one family member's protection of third persons from criminal acts of other family members as well as acts of social guests. *See McDonald v. Lavery,* 27 Mass.App.Ct. 1108, 534 N.E.2d 1190, 1192 (1989) (no liability against parents for adult son's shooting of plaintiff, even though son lived in his parents' home, and parents knew son was an alcoholic, that he became violent when intoxicated, that he owned firearms, and that at times he would shoot firearms when intoxicated).

In *Anthony H. v. John G.,* 415 Mass. 196, 612 N.E.2d 663 (1993), the Supreme Judicial Court addressed claims very similar to those asserted in this case. In *Anthony H.,* a five-year-old boy was sexually abused by an adult male neighbor. The boy sued the mother and aunt of the adult neighbor who lived in the same house as the molester. Just as in this case, the basis for the claim was that the mother and aunt, as owner or occupant of the premises, knew or should have known of the abuse, and should have intervened to stop it. Just as in this case, the plaintiff claimed that the mother and aunt were aware that young boys were sleeping overnight in a bedroom behind closed doors with their adult male relative. The court rejected all claims against the mother and aunt.

First, the court made clear that a finding of liability against the mother could not be predicated on a parent-child relationship between the mother and the adult molester, citing *Alioto v. Marnell,* 402 Mass. 36, 520 N.E.2d 1284 (1988) (parents had no liability for and no duty to supervise and control their 19–year–old son who struck and killed the driver of an automobile while he was driving under the influence of liquor).

Second, the court rejected the claim that liability could be imposed merely because the mother and aunt owned, controlled, and were present in the premises at the time of the molestation. The court acknowledged that ownership and control of the premises may serve as a basis for imposing liability for injuries resulting from the physically danger-ous condition of the premises, but empha-sized that "this principle generally does not extend to criminal conduct of third persons," citing *Andrade v. Baptiste,* 411 Mass. 560, 583 N.E.2d 837, 838–39 (1992) (holding that, as a matter of law, wife was not liable for husband's shooting of third party even though she knew that her husband owned a gun and kept it in her home, which she alone owned, knew that her husband had a prior history of violence, and knew that her hus-band had a serious drinking problem).

In *Anthony H.,* the court acknowledged that it had "on occasion, imposed liability on an owner whose negligence permitted a crime to be committed against a resident of the premises," citing *Mullins v. Pine Manor College,* 389 Mass. 47, 449 N.E.2d 331 (1983) (holding a college liable for negligently fail-ing to protect student who was raped by intruder, on the basis that risks of criminal attacks on female college students were fore-seeable, that the college itself had fostered a reasonable expectation that reasonable care would be exercised to protect students, and that the college had voluntarily assumed the duty to protect its students). In *Anthony H.,* the court concluded that:

> From the evidence presented, it cannot be said that the mother and the aunt could

have reasonably foreseen harm to Anthony when the "sleep overs" began or could have been expected to take affirmative action to protect Anthony from harm.

612 N.E.2d at 666. On this basis, the court reversed a judgment that had been entered against the mother and the aunt in favor of Anthony.

 I conclude that the evidence proffered by plaintiffs in this case will not support findings sufficient to maintain a claim against the Lamy Family Defendants. A finder of facts, on the proffered evidence, could not make a reasoned finding sufficient to support a determination of a duty of reasonable care to take affirmative action to protect Barry Armstrong from harm, even when this evidence is considered in the light most favorable to Barry Armstrong.

The undisputed facts are that Barry Armstrong stayed at the Lamy Family home at Michael Lamy's invitation, and that none of the other Lamy Family Defendants ever invited him over or represented to him that any of them assumed responsibility for him. In contrast to the evidence in *Pine Manor College*, 449 N.E.2d 331, plaintiffs have not presented evidence upon which a reasonable jury could find that any acts or omissions by any of the Lamy Family Defendants fostered an expectation that any of them would protect Barry Armstrong, or that any of the Lamy Family Defendants manifested that any such action would be taken.

The proffered evidence is insufficient to support a finding that any of the Lamy Family Defendants would, in the exercise of reasonable care, have foreseen harm to Barry Armstrong. Plaintiffs have not presented evidence upon which a reasonable jury could find that any of the Lamy Family Defendants was aware that Barry Armstrong slept in Michael Lamy's bedroom some 20 to 30 times, as plaintiffs allege. Plaintiffs point to the fact that family members were at home when Barry Armstrong slept in Michael Lamy's bedroom. Barry Armstrong has stated, however, that he kept the fact that he was sleeping in Michael Lamy's bedroom hidden from other Lamy family members, and that to his knowledge, no Lamy family member ever saw him enter or leave Michael Lamy's bedroom.

Even if there were a genuine issue of fact as to whether some Lamy Family member knew that Barry Armstrong slept in Michael Lamy's bedroom, moreover, the decision in *Anthony H.* indicates that by itself, a child's sleeping over in an adult's bedroom, is not enough to support a claim that a reasonable host would anticipate danger of sexual abuse.

Plaintiffs have presented no evidence sufficient to support a reasoned finding that any of the Lamy Family Defendants was aware of the sexual contact between Barry Armstrong and Michael Lamy. Plaintiffs point to statements made by Philip and Thomas Lamy, calling Barry Armstrong "Michael's little boy," and stating that a gay hotel employee would "like" Barry Armstrong. These comments are ambiguous in their content, were made years after the alleged sexual contact, and do not raise a genuine issue of material fact as to whether Philip and Thomas Lamy knew at the time of the sexual contact that Michael Lamy and Barry Armstrong were engaging in sexual contact. Even if Barry Armstrong's testimony of his personal belief is assumed to be admissible (a dubious proposition at best) his uncommunicated personal belief that Lamy Family Defendants knew he was being sexually abused at the time does not by itself create a genuine issue of material fact.

I conclude that the evidence proffered by plaintiffs is insufficient to support a claim that Massachusetts law imposes a duty to act upon family members in circumstances such as those of the Lamy Family Defendants in this case.

## B. Negligence Claims Against Family Members (Counts 9, 10, 12, and 13)

 To prove a cause of action founded upon negligence a plaintiff must show that all the elements of duty, breach, causation, and damages are satisfied. Since plaintiffs have failed to proffer evidence sufficient to support a claim of duty to take affirmative steps to protect Barry Armstrong from Michael Lamy in the circumstances of this case, the Lamy Family Defendants' failure to act cannot serve as a basis for plaintiffs' claim of

negligent failure to protect under Counts 9 and 12.

 Negligent infliction of emotional distress requires (1) negligence (duty of reasonable care and breach of that duty); (2) emotional distress; (3) causation; (4) physical harm manifested by objective symptomatology; and (5) that a reasonable person would have suffered emotional distress under like circumstances. *Payton v. Abbott Labs,* 386 Mass. 540, 437 N.E.2d 171 (1982). Having failed to satisfy element (1), plaintiffs cannot successfully maintain a claim against any of the Lamy Family Defendants for negligent infliction of emotional distress under Counts 10 and 13.

I conclude that the Lamy Family Defendants are entitled to summary judgment as to the negligence claims in Counts 9, 10, 12, and 13.

## C. Claims Against the Lamy Family Defendants for Intentional Infliction of Emotional Distress (Counts 11 and 14)

 In Counts 11 and 14, plaintiffs have made a claim against each of the Lamy Family Defendants for intentional infliction of emotional distress. To prove intentional infliction of emotional distress, a plaintiff must show

> (1) that the actor intended to inflict emotional distress or that [the actor] knew or should have known that emotional distress was the likely result of [the actor's] conduct ...;
> (2) that the conduct was 'extreme and outrageous,' was 'beyond all possible bounds of decency,' and was 'utterly intolerable in a civilized community,' ...;
> (3) that [the actor's conduct was a] cause of the plaintiff's emotional distress ...;
> (4) that the emotional distress sustained by the plaintiff was 'severe' and of a nature 'that no reasonable [person] could be expected to endure....'

*Agis v. Howard Johnson Co.,* 371 Mass. 140, 355 N.E.2d 315, 318–319 (1976) (citations omitted).

 In circumstances in which a duty to act affirmatively arises, an omission to act, if all other requirements are satisfied, may be considered "extreme" and "outrageous" conduct, satisfying the *Agis* standard. *See Simon v. Solomon,* 385 Mass. 91, 431 N.E.2d 556 (1982) (evidence that water and sewage flooded tenant's basement apartment approximately thirty times warranted finding that landlord violated his duty to tenant recklessly, by outrageous omission to act, and thereby caused her severe emotional harm, and thus, landlord could be held liable for reckless infliction of emotional distress). In the absence of evidence sufficient to support findings of circumstances adequate for a duty to act affirmatively, however, the Lamy Family members' failure to act cannot serve as a basis for a successful claim of intentional infliction of emotional distress. Counts 11 and 14 fail for this reason. *See Mitchell v. Subramanya,* 27 Mass.App.Ct. 365, 538 N.E.2d 319, 321 (1989) (physician did not engage in extreme and outrageous conduct by refusing to produce full medical records, as regulation permitted physician to withhold full record if a summary was furnished).

Plaintiffs have also proffered evidence that Philip and Thomas Lamy made some statements, long after the sexual contact ended, calling Barry Armstrong "Michael's little boy," and commenting that a gay hotel employee would "like" Barry Armstrong. This proffered evidence does not support a claim of intentional infliction of emotional distress. These isolated and ambiguous comments are not the type of evidence that is sufficient to support a finding of extreme and outrageous conduct necessary for a cause of action for intentional infliction of emotional distress under the standard set by *Agis,* 355 N.E.2d 315.

I conclude that the Lamy Family Defendants are entitled to summary judgment as to the intentional infliction of emotional distress claims in Counts 11 and 14.

## D. Loss of Consortium Claim Against Lamy Family Defendants (Count 29)

In Count 29, plaintiff Kim Armstrong brought a loss of consortium claim against all defendants, including the Lamy Family Defendants. She asserts that "as a direct and proximate result of all the Defendants' ac-

tions, [she] has lost the companionship, services and consortium of the Plaintiff Barry Armstrong."

 As noted in Part VII.C, a claim for loss of consortium is separate from the spouse's cause of action, but requires as a prerequisite that the injured spouse have a valid claim. *Sena*, 629 N.E.2d at 994. This court has determined that Barry Armstrong has failed to proffer evidence sufficient to support a claim against the Lamy Family Defendants. Kim Armstrong's loss-of-consortium claim against the Lamy Family Defendants also fails.

I conclude that the Lamy Family Defendants are entitled to summary judgment as to the loss-of-consortium claim in Count 29.

### IX. Claims Against Michael Lamy (Counts 1–8, 29)

#### A. Jurisdictional Issues

 Since I have determined that plaintiffs have failed to proffer evidence sufficient to go to trial on any of plaintiffs' other claims, plaintiffs' only remaining claims are those asserted against Michael Lamy. As explained in Part IV, jurisdiction over these claims is properly exercised through discretionary supplemental jurisdiction under 28 U.S.C. § 1367. I note that, since plaintiffs' remaining claims are all against Michael Lamy only, jurisdiction may also be properly exercised by this court on the independent basis of diversity of citizenship under 28 U.S.C. § 1332(a)(1). It is undisputed that both Barry Armstrong and Kim Armstrong are Massachusetts domiciliaries, and Michael Lamy is a California domiciliary. Thus, for the purposes of 28 U.S.C. § 1332(a)(1), complete diversity exists between the remaining parties. The plaintiffs' complaint alleges that the amount in controversy exceeds the sum of $50,000, exclusive of interest and costs.

#### B. Claims Asserted

Plaintiffs assert the following claims against Michael Lamy. Barry Armstrong claims that Michael Lamy negligently failed to fulfill his duty of care toward Barry Armstrong (Count One), negligently failed to obtain professional treatment for his psycho-

logical disorder of uncontrollable urges to molest children (Count Two), negligently failed to remove himself from a position in which he had responsibility for the care and control of children (Count Three), intentionally inflicted emotional distress (Count Four), assaulted Barry Armstrong (Count Five), battered Barry Armstrong (Count Six), negligently inflicted emotional distress (Count Seven), and violated the Massachusetts Civil Rights Act (Count Eight). Kim Armstrong claims loss of consortium against Michael Lamy (Count 29).

#### C. Michael Lamy's Motion for Summary Judgment

Michael Lamy has moved for summary judgment on two grounds only: (1) that the statute of limitation bars plaintiffs' action, and (2) that the loss of consortium claim has no merit.

#### (1) Statute of Limitation

 Michael Lamy has incorporated the Lamy Family Defendants' arguments regarding the statute of limitation. I have already determined in Part V that summary judgment on the statute of limitation ground is inappropriate as to Barry Armstrong's state-law claims, including Barry Armstrong's state-law claims against Michael Lamy.

#### (2) Loss of Consortium Against Michael Lamy (Count 29)

In Parts VII.C and VIII.D, I concluded that Kim Armstrong's loss of consortium claim failed as to the Municipal Defendants and Lamy Family Defendants because a claim for loss of consortium requires as a prerequisite that the injured spouse have a valid claim, and because Barry Armstrong did not proffer sufficient facts to support a claim against those defendants. Since I am not able to determine at this time as a matter of law that Barry Armstrong does not have a valid claim against Michael Lamy, I must analyze Kim Armstrong's ancillary loss of consortium claim against Michael Lamy more closely.

■ Michael Lamy has incorporated the Lamy Family Defendants' argument that the loss of consortium claim fails because Kim Armstrong and Barry Armstrong were not married at the time of the tortious conduct. This argument is based upon *Feliciano v. Rosemar Silver Co.*, 401 Mass. 141, 514 N.E.2d 1095, 1096 (1987), which held that there can be no recovery from loss of consortium where, although the couple had lived together for twenty years, they were not married "at the time of the injury." *Feliciano* established that a plaintiff must have been married in order to bring a loss of consortium claim; it did not establish the rules for determining when a loss of consortium accrues.

■ Although a cause of action for loss of consortium "in most cases would accrue at the same time as would the action for personal injuries, this may not always be true." *Olsen v. Bell Tel. Laboratories, Inc.*, 388 Mass. 171, 445 N.E.2d 609, 612 (1983). A claim for loss of consortium is separate from the injured spouse's claim. The dates of accrual of the separate claims must be determined separately. *Id.*

■ Loss of consortium is governed by the three-year limitation period prescribed by Mass.Gen.L. ch. 260 § 2A. *Olsen*, 445 N.E.2d at 612. In determining when a cause of action for loss of consortium accrued, Massachusetts courts apply the same discovery rule as applied to the original claim. *Olsen*, 445 N.E.2d at 612. Under the "discovery rule" the limitation period does not begin to run until the plaintiff has "(1) knowledge or sufficient notice that [he or she] was harmed and (2) knowledge or sufficient notice of what the cause of the harm was." *Bowen v. Eli Lilly & Co.*, 408 Mass. 204, 557 N.E.2d 739, 742 (1990).

■ The record before the court in this case would not support a determination as a matter of law that Kim Armstrong's cause of action did not accrue at the same time as Barry Armstrong's cause of action. Consortium includes the companionship, affection, and sexual enjoyment of one's spouse. *Agis v. Howard Johnson Co.*, 371 Mass. 140, 355 N.E.2d 315 (1976). The undisputed facts are that Barry and Kim Armstrong were married on April 7, 1990, and that Kim Armstrong suffered an appreciable loss of consortium beginning in September of 1991, when Barry Armstrong first began to suffer from post-traumatic stress disorder, paranoia, insomnia, headaches, nightmares, appetite loss, dysthymia, stomach aches, extreme mental distress and emotional harm. A reasonable jury could find that Kim Armstrong learned of the cause of her husband's symptoms in October 1992. The plaintiffs' complaint was filed in 1994, within the three-year period, and thus the loss of consortium claim cannot now be determined as a matter of law to be untimely.

I conclude that Defendant Michael Lamy's Motion for Summary Judgment must be denied.

## X. Conclusion

The following claims against defendant Michael Lamy remain in this case: Counts 1, 2, 3, 4, 5, 6, 7, and 8 by Barry Armstrong and Count 29 by Kim Armstrong.

I need not decide unsettled questions that remain as to several of these Counts, including, (1) whether there is any evidentiary or legal basis for the claim of negligent failure to seek counseling (Count 2), (2) whether Michael Lamy's alleged conduct constitutes threats, intimidation or coercion within the meaning of the MCRA (Count 8), and (3) whether a loss of consortium claim (Count 29) may be maintained ancillary to an MCRA claim (*see Tauriac v. Polaroid Corp.*, 716 F.Supp. 672, 674 (D.Mass.1989) (predicting that Massachusetts courts would not allow a loss of consortium claim predicated on Massachusetts Civil Rights Act).

I do not expect to start trial without a greater showing of particularity of claim on these issues than that made thus far. A court may require that such a showing be made in the context of an appropriate second motion for summary judgment by Michael Lamy, if one is filed, or by separate order in this particular case, or under the generally applicable Local Rules of this court with respect to the submissions required by parties in preparation for the Final Pretrial Conference.

## INTERLOCUTORY ORDER

For the foregoing reasons, it is hereby ORDERED:

(1) Municipal Defendants' Motion for Summary Judgment (Docket No. 44, filed November 20, 1995) is ALLOWED;

(2) Municipal Defendants' (Second) Motion for Summary Judgment (Docket No. 58, filed December 29, 1995), is ALLOWED;

(3) Motion for Summary Judgment of Defendants Thomas Lamy (Individually and as Executor), Philip Lamy and Catherine (Lamy) Puzzo (Docket No. 53, filed December 22, 1995), is ALLOWED;

(4) Motion for Summary Judgment of the Defendant Michael Lamy (Docket No. 70, filed March 13, 1996) is DENIED;

(5) No party having moved for separate final judgment, and no showing having been made that prerequisites of a separate final judgment could be satisfied in this case, the present order is interlocutory.

(6) The parties are directed to appear before this court for a Case Management Conference, to be held on September 17, 1996, at 4:00 p.m.